**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                              Cr. No. 05-593 JH

SAUL OMAR ANDINO-MORADEL,

        Defendant.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant's *Motion to Suppress and Memorandum in Support* [Doc. No. 19], which he filed on June 24, 2005. On September 8, 2005, the Court held an evidentiary hearing on the motion. Elaine Ramirez appeared on behalf of the United States, and John Robbenhaar appeared on behalf of the Defendant, who was present. The primary issue before the Court is whether Defendant, a passenger aboard an Amtrak train traveling through Albuquerque, New Mexico, was illegally detained and whether he voluntarily gave law enforcement officials consent to search the duffel bag where the evidence against Defendant was found. After carefully considering the testimony of the witnesses, the exhibits admitted into evidence, and the law, the Court concludes that the motion to suppress should be denied.

## FACTS

This case stems from Defendant's arrest in Albuquerque, New Mexico, on March 2, 2005. Based upon the evidence presented at the evidentiary hearing on September 8, 2005, the Court makes the following findings of fact.

On March 1, 2005, Defendant Saul Omar Andino Moradel ("Defendant")[1] and Lester Giovanni-Chavez ("Giovanni-Chavez") boarded an Amtrak train in Los Angeles heading east to New York City. On March 2, 2005, that train pulled into the station in downtown Albuquerque, New Mexico, where both Defendant and Giovanni-Chavez alighted onto the platform.

DEA Special Agent Gerald W. Perry ("Perry") also went to the Albuquerque train station that day as part of his duties with the DEA Drug Interdiction Unit. Before going to the station, Perry had reviewed the passenger name record for the train on which Defendant was traveling. Perry noticed that Defendant and Giovanni-Chavez had purchased one-way tickets from Los Angeles to New York (a three-day trip), that they paid $770 in cash for their tickets, and that they had purchased their tickets on the day of departure, March 1. Perry testified that in his experience, drug couriers often purchase one-way train tickets with cash on the day of departure, and that drug couriers often choose to travel by train because it involves virtually no security as compared to air travel. Accordingly, Perry went to the train station on March 2 with the intent of finding Defendant and Giovanni-Chavez. Perry wore plain clothes, and although he did carry a firearm and handcuffs, those items were hidden underneath his clothing.

When the train arrived at the station, Perry and other agents were waiting on the platform. Two men, later identified as Defendant and Giovanni-Chavez, stepped off the train and walked along the upper platform, which is a public area. Perry approached Giovanni-Chavez, who was standing near Defendant. Perry showed Giovanni-Chavez his DEA badge and credentials and asked permission to speak with him, at which point Defendant slowly walked away, down the platform.

---

[1] Defendant is a 53-year-old male from Honduras with a sixth grade education. He speaks Spanish and has no training in the English language.

Perry found this behavior odd, because in his experience travel companions normally do not leave when a member of their group has been approached by law enforcement.

At this point, Perry started a discussion with Giovanni-Chavez that can accurately be described as an awkward, disjointed mix of English and Spanish.[2] During the course of the conversation, Giovanni-Chavez appeared to indicate that he was traveling from Los Angeles, where he was visiting either a cousin or his half-brother, back to his home in the borough of Brooklyn in New York City. Giovanni-Chavez queried the need for Perry's questions, asking "What happened, are there problems?" to which Perry responded "No, no, no, no, no problem," and then resumed his questioning without explanation. Initially, Giovanni-Chavez stated that he was alone, but shortly thereafter he said that he was traveling with his friend (erroneously described by Perry as "Andino Saul"), who lives in New Jersey. Perry asked to see Giovanni-Chavez's ticket, but he said that it was on the train. Perry asked Giovanni-Chavez if he could show him the ticket, at which point Giovanni-Chavez walked onto the train accompanied by Perry. The pair walked to sleeper car #431, bedroom number nine. Giovanni-Chavez retrieved an Amtrak ticket folder from the bedroom and handed it to Perry, who was also inside the room. The folder contained tickets for Defendant and Giovanni-Chavez for travel from Los Angeles to New York in space nine within car #431. Perry reviewed the tickets and returned them to Giovanni-Chavez. Perry also asked for and received Giovanni-Chavez's New York identification card, which he likewise reviewed and returned.

Perry asked Giovanni-Chavez if he had pistols, which Giovanni-Chavez denied. Next, Perry asked Giovanni-Chavez for consent to search his person, and Giovanni-Chavez agreed. Perry

---

[2] Perry recorded his discussion with Giovanni-Chavez on a recording device in his left front pocket, and the transcript of that tape was admitted into evidence at the hearing without objection. The transcript is attached as Exhibit 1 to this Memorandum Opinion and Order.

3

conducted a pat-down search but found no contraband. Perry also asked Giovanni-Chavez if he had luggage, and Giovanni-Chavez responded that he did not. Perry asked about his friend's luggage or suitcases, to which Giovanni-Chavez responded, "He is below. I don't know. Ask him." Giovanni-Chavez also informed Perry that he and Defendant had traveled from New York to Los Angeles on a bus to visit his half-brother, and that they had been there for four days, an amount of time he later revised to two or three days. Giovanni-Chavez again indicated that he had no luggage. Although the conversation between Perry and Giovanni-Chavez is difficult to follow, it is possible to interpret Giovanni-Chavez as saying that Defendant had no luggage either. Perry found it odd that the two men had traveled from New York to Los Angeles for a trip up to seven days in length without any form of luggage that might contain toiletries or a change of clothing.

After his interview of Giovanni-Chavez had ended, Perry walked off the train and onto the platform in an effort to find Defendant. Perry found him walking around the jewelry stands on a nearby platform. Again, Perry displayed his DEA badge and credentials, identified himself as a law enforcement officer, and asked Defendant, "Do you speak English?" Defendant responded, "Spanish." Perry then attempted to carry out the remainder of the discussion in Spanish.[3] Perry asked for permission to speak with Defendant, who nodded and said, "okay." Perry asked Defendant about his destination, and Defendant said "New York." Perry asked Defendant where he lived in New York, to which Defendant responded, "New York." Next, Perry asked Defendant for identification, which he provided in the form of a New York identification card and which confirmed that Defendant resided in an apartment in the Bronx, New York City. Perry reviewed the card and

---

[3] Again, Perry recorded this encounter between himself and the Defendant, and the transcript of their conversation begins on page 9 of the transcript of that recording, attached as Exhibit 1 to this Memorandum Opinion and Order.

returned it to Defendant, who asked, "What is happening?"  As with Giovanni-Chavez, Perry did not answer the question, saying only "Thank you sir."

At this point, the conversation between Defendant and Perry became very muddled.  Perry attempted to ask Defendant questions in broken Spanish regarding his travel plans, his traveling companion, and his luggage.  It is difficult to determine, based upon the tape recording and the transcription, what level of understanding or communication there was between Perry and Defendant.  It does appear that Defendant conveyed to Perry that that he was traveling from Los Angeles, that he had been there two days, and that he had come to see his friend.  However, in several instances, it is clear from the conversation that Defendant did not understand Perry's questions:

Perry: *Su boleto o su equipaje, maleta sube al tren?*
Your/his ticket or your/his luggage, suitcase climb up the train? (sic)[4]

Defendant: *Eh?*
What?

Perry: *Su equipaje, maletas?*
Your/his luggage, suitcases?

Defendant : *Oh, no entiendo.*
Oh, I don't understand.

A short time later in their conversation, Perry and Defendant had the following exchange:

Perry: *Can you show me ... Tu amigo equipaje maletas?*
Can you show me ... Your friend luggage suitcase?

Defendant: Yeah.

Perry: *Tu amigo, equipaje, maletas?*

---

[4] The Court notes that in Spanish, the word "su" is a possessive that means either "your" (in the formal sense), "their," or "his."  Without seeing the speaker's gestures, facial expressions, and other non-verbal forms of communication, it does not appear that Defendant's interpretation of Perry's words, further explained below, was unreasonable.

5

|   |   |
|---|---|
|   | Your friend, luggage, suitcases? |
| Defendant: | *Eh?  Si, traje maletas maleta.*<br>Eh?  Yes, I brought suitcase. |
| Perry: | *O yo amigo?*<br>Or I friend? [sic] |
| Defendant: | Yeah. |

      According to Perry's testimony, he believed that he asked Defendant if he had any luggage, and Defendant said that yes, he had one piece, motioning with his hands to indicate the size of his bag.  Defendant also indicated that his bag was on the train.  However, the Court notes that the recording of Perry's conversation with Defendant does not contain a clear indication of such an exchange of information, nor does it convey any gestures or other nonverbal communication.  Furthermore, the Court notes that Defendant testified that he understood Perry to be asking about his friend Giovanni-Chavez's bag, an interpretation that was reasonable given Perry's limited knowledge of the Spanish language and the fact that Perry repeatedly used the word "amigo," which means friend, when asking Defendant about luggage.

      After this conversation, Defendant led Perry to the common luggage area on the first level of the train and pointed to a small, soft-sided black duffel bag resting on top of a larger, dark blue bag clearly marked with the brand name "Nautica," which in turn was sitting on the floor.  Perry asked for and received consent to search the smaller black bag, where he found only various items of clothing and no contraband.  Perry then asked Defendant for consent to search a white, plastic shopping bag that Defendant was carrying as well as to search Defendant's person.  Defendant gave verbal consent to both searches, and Perry found no contraband. The entirety of this portion of the encounter took place in the narrow, public hallway adjacent to the common baggage area, and when

it was over Perry turned off his recording device. At that point, Defendant placed his plastic white shopping bag into the small black duffel bag and walked away from Perry and down the stairs of the train.

Next, Perry examined the exterior of the dark blue "Nautica" bag and observed that it did not have a name tag. Joined by DEA Special Agent Kevin Small ("Small"), who was also dressed in plain clothes, Perry picked up the Nautica bag and carried it upstairs to bedroom nine in car 431 in order to find out if Defendant and/or Giovanni-Chavez owned the bag. The Agents found Defendant and Giovanni-Chavez seated face-to-face inside their roomette, a cramped space measuring 3'6" by 6'6", with just enough room for two adults. Perry and Small stood in the long, narrow hallway[5] on either side of the doorway of the roomette (Perry on the left and Small on the right), with the Nautica bag on the hallway floor between them. The Nautica bag was roughly the same width as the doorway of the roomette. As they looked into the roomette, the door was open; Defendant was seated on their left and Giovanni-Chavez was on their right. Perry identified Small as a law enforcement officer; he then asked for and received consent to speak with them. Perry wished to determine whether either passenger had an interest in the Nautica bag, but his Spanish was extremely limited such that he did not know how to ask the standard questions on that subject. In order to facilitate the conversation with Defendant and Giovanni-Chavez, Perry contacted DEA Special Agent Joe Mata ("Mata"), who is fluent in Spanish. Using his mobile phone, Perry called Mata and activated the speaker phone device. Perry asked questions in English, which Mata translated into Spanish. Defendant and Giovanni-Chavez answered in Spanish, which Mata then translated into English. For some

---

[5] Based upon witness testimony and photographs admitted into evidence, the Court concludes that the hallway was three to three and a half feet in width.

unexplained reason, Perry left his recording device in the "off" position, and accordingly there is no tape of the following conversation.

Assisted by Mata who translated his questions, Perry first asked Defendant and Giovanni-Chavez whether the Nautica bag belonged to them, and both men responded no. Next, Perry asked the men if they had anything inside the bag that belonged to them, and both men answered in the negative. Perry then asked the two whether they had any interest in the bag, and again they both said no. Perry's fourth question was whether the men cared what happened to the Nautica bag. Giovanni-Chavez said no, but Defendant did not immediately answer the question. Because Defendant did not answer, Mata asked Perry to hand the cell phone to Defendant so that they could speak to each other directly. Perry did so, and then stepped back out into the hallway.

Mata and Defendant then had a conversation in Spanish, at the conclusion of which Defendant handed the cell phone back to Perry. Perry then spoke to Mata, who informed him that Defendant had said that the Nautica bag belonged to him. Perry asked Mata to confirm this statement, and handed the phone back to Defendant, who repeated his assertion that the bag belonged to him. Perry then asked Mata to ask Defendant for consent to search the bag. Defendant responded that the bag contained nothing illegal, and that Perry could search it. At that point, Perry carried the Nautica bag back downstairs to the common luggage area, accompanied by Small and Defendant. There Perry searched the bag, where he discovered clothing and a hard bundle wrapped in a towel, which based upon his training and experience he believed to contain illegal narcotics. Small handcuffed Defendant while Perry walked upstairs to the roomette to arrest Giovanni-Chavez, and both men were taken to DEA headquarters. At some point after the arrest, law enforcement officials informed Defendant and Giovanni-Chavez in Spanish of their *Miranda* rights. Subsequent field testing identified the bundle

in the Nautica bag as approximately 1.4 kilograms of cocaine.

## DISCUSSION

The United States Supreme Court has delineated three types of police-citizen encounters: (1) consensual encounters which do not implicate the Fourth Amendment, *see, e.g., Michigan v. Chesternut*, 486 U.S. 567, 574-76, 108 S.Ct. 1975, 1979-81, 100 L.Ed.2d 565 (1988); *INS v. Delgado*, 466 U.S. 210, 218-21, 104 S.Ct. 1758, 1763-65, 80 L.Ed.2d 247 (1984); (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity, *see, e.g., United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884-85, 20 L.Ed.2d 889 (1968); and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause. *See, e.g., Hayes v. Florida*, 470 U.S. 811, 815-16, 105 S.Ct. 1643, 1646, 84 L.Ed.2d 705 (1985); *Dunaway v. New York*, 442 U.S. 200, 212-16, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979). In this case, the Court must determine whether the encounters between Defendant and law enforcement officials, first on the train platform and then later in the train roomette, constitute consensual encounters or investigative detentions and whether the subsequent consent to search given by Defendant to Perry was voluntary.

**I.   THE INITIAL ENCOUNTER BETWEEN AGENT PERRY AND DEFENDANT ON THE PLATFORM AND COMMON LUGGAGE AREA**

In *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the Supreme Court set forth the governing standard for determining whether a police-citizen encounter implicates the Fourth Amendment:

> [I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the

> encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

*Id.* 501 U.S. at 439, 111 S.Ct. at 2389 (emphasis added).

As the United States Supreme Court has explained, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. at 434, 111 S.Ct. at 2386. *See also Florida v. Rodriguez*, 469 U.S. 1, 5-6, 105 S.Ct. 308, 311, 83 L.Ed.2d 165 (1984) (per curiam). Rather, Supreme Court authority dispels any notion that merely approaching a person in a public place and asking him to identify himself implicates the Fourth Amendment. *See United States v. Drayton*, 536 U.S. 194, 200, 122 S.Ct. 2105, 2110 (2002) ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen."); *INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762-63 (1984). Nor does an officer's request for consent to search a person's luggage turn an otherwise consensual encounter into an investigative detention "as long as the officers do not convey a message that compliance with their request is required." *Bostick*, 501 U.S. at 435, 111 S.Ct. at 2386 (citations omitted). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage--provided they do not induce cooperation by coercive means." *Drayton*, 536 U.S. at 201, 122 S.Ct. at 2110

Defendant argues that Perry seized him during their encounter on the train station platform because Perry's actions did not convey the message that Defendant was free to leave or terminate the encounter at any time. Defendant contends that Perry's failure to identify himself as a drug interdiction officer, Perry's failure to inform Defendant that he could refuse to speak to him, Perry's

use of short, choppy, direct questions about tickets and baggage, and the fact that the encounter took place after Perry had already questioned Giovanni-Chavez and boarded the train with him all created a situation in which no reasonable person in Defendant's position would feel free to leave.

The Court disagrees. Perry opened the conversation by asking Defendant if he spoke English, and then by saying (in Spanish), "I am a police officer. Will you permit me to speak with you?" Perry phrased his words as a request, rather than as a demand as Defendant implies in his motion. In addition, the encounter took place in a public area, where Defendant was free to walk away at any time. Although Perry had already conversed with Giovanni-Chavez and boarded the train with him, Defendant was not present for their encounter, which lasted approximately six minutes. Perhaps if the initial discussion between Perry and Giovanni-Chavez had resulted in an arrest, it would have engendered in Defendant a reasonable feeling of coercion. However, that not being the case, the fact that Perry had boarded the train with Defendant's travel companion does not in and of itself create a coercive situation. Finally, as explained by the Supreme Court in *Bostick*, *Rodriguez*, *Drayton*, and *Delgado*, *supra*, the nature and the subject matter of Perry's questions were entirely permissible. Therefore, under the totality of the circumstances, the discussion between Perry and the Defendant that began on the train station platform and ended in the train's common luggage area was a consensual encounter rather than an investigative detention.

## II.     THE SUBSEQUENT ENCOUNTER IN THE SLEEPER ROOMETTE

Defendant contends that even if his initial encounter with Perry was consensual, his subsequent conversation with Perry and Small was an investigative detention. Defendant reasons that the tight confines of the roomette where he and Giovanni-Chavez were seated, combined with the facts that the agents placed themselves and the Nautica bag in the narrow hallway just outside the

11

doorway (effectively blocking his egress from the roomette) and the nature of Perry and Mata's "direct and focused" questioning, made the encounter coercive.

The location of the encounter in the cramped roomette is relevant, although it alone cannot be determinative. *See Bostick*, 501 U.S. at 437, 111 S.Ct. at 2387 ("Where the encounter takes place is one factor, but it is not the only one."). In determining whether a defendant was seized, the Tenth Circuit has considered a variety of factors, including whether the encounter occurred in a confined or nonpublic space, *United States v. Griffin*, 7 F.3d 1512, 1518-19 (10th Cir. 1993); *United States v. Bloom*, 975 F.2d 1447, 1453-54 (10th Cir. 1992); *United States v. Ward*, 961 F.2d 1526, 1531 (10th Cir. 1992); the officers confronting the subject were armed or uniformed, *Bloom*, 975 F.2d at 1454; the officers brandished weapons, *United States v. Hill*, 199 F.3d 1143, 1148 (10th Cir. 1999); more than one officer confronted the subject, *Bloom*, 975 F.2d at 1454; *Ward*, 961 F.2d at 1533; the officers exhibited an intimidating or coercive demeanor, *Griffin*, 7 F.3d at 1519; *Ward*, 961 F.2d at 1533; the officers physically touched the subject, *Hill*, 199 F.3d at 1148; and the officers asked the subject potentially incriminating questions, *Griffin*, 7 F.3d at 1519; *Ward*, 961 F.2d at 1534; *Bloom*, 975 F.2d at 1454. However, the Tenth Circuit has steadfastly refused to view any one of these factors as dispositive. *See, e.g., Griffin*, 7 F.3d at 1518 ("In the past, we have avoided hardline rules to govern [seizure] analysis, and our opinion today should not be interpreted as an exhaustive announcement"); *see also United States v. Little ("Little I")*, 18 F.3d 1499, 1503 (10th Cir. 1994) (en banc) (noting that "only in rare instances will any one factor produce an inexorable conclusion that a seizure has occurred").

*Little I*, and the appeal after remand in *United States v. Little ("Little II")*, 60 F.3d 708 (10th Cir. 1995), provides this Court with some guidance. In *Little I*, Agent Small questioned the

defendant, who was seated in her roomette onboard an Amtrak train traveling through Albuquerque. There, as with the Defendant in this case, Ms. Little had purchased a one-way eastbound ticket with cash shortly before boarding the train. Small asked her pointed, incriminating questions and did not inform her that she could terminate the encounter at any time. Overruling any implication from previous cases that police-citizen encounters occurring in train compartments are necessarily seizures, in *Little I* the Tenth Circuit, sitting *en banc*, "reject[ed] the argument that the location of an encounter on a train (outside the train, in a public coach, or in a private roomette) is determinative of the seizure question." *Id*. at 1504. The court also noted that Small had no legal duty to advise Little that she had the right to refuse to answer his questions.[6] *Id*. at 1505. In addition, the court addressed the issue of a defendant's subjective characteristics (such as age, sex, race, education, and national origin) as follows:

> We stated in *Bloom*, and reiterated in *Laboy* and *Zapata*, that the particular personal traits or subjective state of mind of the defendant are irrelevant to the objective "reasonable person" test set out in *Bostick*, "other than to the extent that they may have been known to the officer and influenced his conduct." *Bloom*, 975 F.2d at 1455 n. 9; *see also [U.S. v.] Zapata*, 997 F.2d [751] at 757 [(10th Cir.1993)]; *Laboy*, 979 F.2d at 799. Thus, unless there is evidence that Agent Small knew of any particular personal traits or characteristics of Ms. Little, and they influenced his conduct, they are irrelevant to the question of whether the encounter between Agent Small and Ms. Little was consensual and we reject any rule that would classify groups of travelers according to gender, race, religion, national origin or other comparable status.

---

[6] However, other Tenth Circuit opinions issued after *Little I* such as the one in *United States v. Orrego-Fernandez*, 78 F.3d 1497 (10th Cir. 1996), contain language seemingly in conflict with *Little I*, stating that failure to inform a person that she or he may refuse to consent or to answer questions remains an "important" factor in an assessment of the totality of the circumstances. 78 F.3d at 1505 (citing and quoting from *United States v. McSwain*, 29 F.3d 558, 563 (10th Cir. 1994)). Accordingly, the Court will assign that factor neither less nor more weight than any of the other factors enumerated by the Tenth Circuit.

18 F.3d at 1505. Finally, the *Little I* court found that Small's use of pointed, incriminating questions to be "irrelevant to the totality of the circumstances surrounding the encounter." *Id*. at 1506. The Tenth Circuit then remanded the case to the district case for a determination of the coercion issue under the totality of the circumstances, rather than giving any one factor determinative weight as it had on its first round analysis. The district court applied that test and again granted the motion to suppress, a ruling that the government appealed in *Little II*.

In *Little II*, 60 F.3d 708, 712 (10th Cir. 1995), the Tenth Circuit held that the mere fact that officers ask incriminating questions is not relevant to the totality-of-the-circumstances inquiry; rather, what matters instead is "the manner" in which such questions were posed. As *Little II*, *id*. (internal quotation marks omitted) explained, the court may look at the officer's tone: "Accusatory, persistent, and intrusive questioning can turn an otherwise voluntary encounter into a coercive one." Furthermore, Judge Holloway writing for the majority in *Little II* reiterated that a police officer's failure to advise a defendant of his right to decline to answers is still a viable consideration in the totality of the circumstances test:

> The giving of such advisements is relevant to the inquiry, and it logically follows that the omission of such advisement is also relevant, while not dispositive, in making the finding "whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's request or otherwise terminate the encounter." *Bostick*, 501 U.S. at 439, 111 S.Ct. 2382.

60 F.3d at 713.

Turning now to the facts of the case presently before the Court, it is clear that the encounter between Defendant, Perry and Small in the roomette presents a closer question than that of the first encounter on the platform, with factors that weigh in favor of both sides of the argument. On the one

hand, Perry did question Defendant while he was seated inside the small roommette. While Perry did not enter the roomette, the presence of Perry, Small, and the Nautica bag in the narrow hallway just outside the doorway of the roomette effectively blocked any mode of exit that Giovanni-Chavez or Defendant may have had. Although anyone on either side of the hallway could have heard the agents' end of the conversation, rendering the encounter semi-public, the *de facto* restraint on the subjects' ability to leave, combined with the crowded conditions in the hallway preventing a passerby from effectively seeing into the roomette, render this a rather private encounter. Neither Perry nor Mata informed the two men that they had the right to decline to answer questions or otherwise terminate the encounter.

On the other hand, several factors weigh against finding that Defendant was detained. Both Perry and Small were plain-clothed, and neither brandished a weapon. The presence of two officers was not unreasonable, particularly because they were approaching two subjects. During the first encounter, Perry asked to see Defendant's identification, but he had returned it promptly. While the roomette may have been cramped, Giovanni-Chavez and Defendant chose to enter that spaced of their own accord; Perry and Small did not direct them to enter that small space for questioning. Though it may have been difficult for Giovanni-Chavez and Defendant to leave the roomette, they could have protected their privacy (either before or during the encounter) by closing the sliding door, an option that they did not exercise. In addition, there is no evidence that the agents exhibited an intimidating or coercive demeanor toward Defendant or physically touched him in any way. Furthermore, there is no evidence that Small knew that Defendant was from Honduras, that he had a limited education, or that in the past Defendant had experienced any form of police brutality. Finally, the questions that Perry asked (via Mata) were not particularly incriminating in nature, and

there is no evidence that either Perry or Mata asked the questions in a manner that was intrusive or accusatory. Perry and Mata did not ask whether the two men had stored drugs or other contraband in the bag—they merely asked whether either of the men owned the bag or cared what happened to it.

Although this presents a close case, the Court finds that the Government, which bears the burden of proof on this issue, *see United States v. McRae*, 81 F.3d 1528, 1536-37 (10th Cir. 1996), has come forward with sufficient evidence to show that the encounter in the roomette was consensual. Under the totality of the circumstances, the Court believes that Defendant was free to terminate the encounter at any time. This case is distringuishable from *United States v. Griffin*, 7 F.3d 1512 (10th Cir. 1993) where, among other significant factors, police separated the defendant from her friend and took her from an open conference area to a small police-restricted room solely within their control. "Where police are in full control of the questioning environment, custody is more easily found." *Id*. at 1518-19. That was not the case here; Defendant went to his roomette (an area not under police control) entirely of his own volition and left the door open, both prior to and during the encounter with Perry and Small. When the Court considers that fact along with the other factors enumerated above, it concludes that under the totality of the circumstances the encounter was not an investigatory detention for which reasonable suspicion was required.

### III.   CONSENT TO SEARCH THE NAUTICA BAG

Defendant's final argument is that his consent to the search of the Nautica bag was involuntary. This argument fails for many of the same reasons outlined in Part II of this Memorandum Opinion and Order, *supra*.

There appears to be no dispute that the Nautica bag is an "effect" protected by the Fourth

Amendment, and that as one claiming ownership of the bag, Defendant has standing to contest the search of the bag. The general rule is that law enforcement officers must obtain a warrant in order to search one's personal effects. However, "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Stated another way, "[t]he [Fourth Amendment] prohibition does not apply ... to situations in which voluntary consent has been obtained, either from the individual whose property is searched or from a third party who possesses common authority over the premises." *Rodriguez*, 497 U.S. at 181, 110 S.Ct. 2793 (citations omitted). Thus, the question is whether Defendant gave valid consent to the search of the Nautica bag. The voluntariness of consent must be determined from the totality of the circumstances, and the government bears the burden of proof on the issue. *See U.S. v. Soto*, 988 F.2d 1548, 1557 (10th Cir. 1993) (citation omitted); *United States v. Cody*, 7 F.3d 1523, 1526 (10th Cir. 1993) (the government has the burden of proving valid consent to a warrantless search).

Whether Defendant's consent to search was voluntary is a question of fact determined from the totality of the circumstances. *United States v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000). The Tenth Circuit has utilized a two-part test to make this determination: "First, the government must proffer 'clear and positive testimony that consent was unequivocal and specific and freely given.' Furthermore, the government must prove that this consent was given without implied or express duress or coercion." *See United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996) (quoting *United States v. Angulo-Fernandez*, 53 F.3d 1177, 1180 (10th Cir. 1995)).

The undisputed evidence is that Defendant specifically, clearly, and unequivocally gave Perry consent to search the Nautica bag. Thus, the first prong has been satisfied, and the Court must turn

17

to the question of whether that consent was obtained through duress or coercion. "In determining whether a consent to search is voluntary, a court should consider the following: physical mistreatment, use of violence or threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant." *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994). Other factors tending to show that consent was coerced include the presence of more than one officer, the display of weapons, physical touching, and use of an aggressive tone. *United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991). In all, the court should consider whether the officer's conduct constituted a coercive show of authority, such that a reasonable person would believe he was not free to "decline the officer's requests or otherwise terminate the encounter." *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000) (quotation omitted).

As explained above, in this case there is no evidence that Perry or Small used physical mistreatment, violence, threats of violence, display of weapons, physical touching, an agressive tone of voice, promises, inducements, deception, or trickery in order to obtain Defendant's consent to search the Nautica bag. Indeed, Defendant does not allege any "physical mistreatment, violence, threats, promises or inducements, deception or trickery, display of a weapon, [or] use of a commanding manner or tone of voice." *United States v. Hernandez*, 93 F.3d 1493, 1500 (10th Cir. 1996). That Defendant is not a native English speaker is a factor to be considered in the determination of voluntariness. *See, e.g., United States v. Contreras*, 372 F.3d 974, 977 (8th Cir. 2004) (noting the variety of factors to be considered). However, in this case that factor is essentially negated by the fact that Mata translated Perry's questions from English into Spanish, and therefore Defendant was able to understand what was being asked of him. While more than one officer was

present, that fact alone does not amount to duress or coercion. Accordingly, under the totality of the circumstances, the Court finds that Defendant voluntarily gave Perry his consent to search the bag where the contraband was found.

Having found no violation of Defendant's Fourth Amendment rights,

**IT IS THEREFORE ORDERED** that Defendant's *Motion to Suppress and Memorandum in Support* [Doc. No. 19] is **DENIED**.

　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　**UNITED STATES DISTRICT JUDGE**